```
Approved: _____
          BENJAMIN A. GIANFORTI
          Assistant U.S. Attorney

Before:   HONORABLE SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York
```

**21 MAG 9854**

```
- - - - - - - - - - - - - - - - - x
                                   :    SEALED COMPLAINT
UNITED STATES OF AMERICA           :    Violations of 18 U.S.C.
                                        §§ 371 and 1956 and
                                   :    21 U.S.C. § 846
             - v. -                :

JESUS MANUEL BRITO, and            :
JOSE RAFAEL BRITO,
                                   :
                                        COUNT OF OFFENSE:
             Defendants.           :    NEW YORK & BRONX

- - - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

   CHRISTOPHER FANT, being duly sworn, deposes and says that he is Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE
(Conspiracy to Commit Money Laundering)

   1.   From at least in or about September 2019 through at least in or about March 2020, in the Southern District of New York and elsewhere, JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to violate the money laundering laws of the United States.

   2.   It was a part and an object of the conspiracy that JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, the proceeds of the sale and distribution of a

controlled substance, in violation of 21 U.S.C. § 841(a)(1), would and did conduct and attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of the sale and distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
(Money Laundering)

3. From in or about September 2019 through in or about March 2020, in the Southern District of New York and elsewhere, JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, the proceeds of the sale and distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), conducted and attempted to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of the sale and distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). .

(Title 18, United States Code, Section 1956(a)(3)(B) & 2.)

## COUNT THREE
(Narcotics Conspiracy)

4. From at least in or about February 2020 through at least in or about September 2020, in the Southern District of New York and elsewhere, JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

5. It was a part and an object of the conspiracy that JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a) (1).

6. The controlled substance involved in the offense was 400 grams or more of a mixture or substance containing a

detectable amount of fentanyl, in violation of Title 21 United States Code, Section 841(a)(1) and 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT FOUR
(Bulk Cash Smuggling Conspiracy)

7. In or about December 2019, in the Southern District of New York and elsewhere, JESUS MANUEL BRITO, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, bulk cash smuggling out of the United States, in violation of Title 31, United States Code, Section 5332.

8. It was a part and object of the conspiracy that JESUS MANUEL BRITO, the defendant, and others known and unknown, would and did, with the intent to evade a currency reporting requirement under section 5316, knowingly conceal more than $10,000 in currency or other monetary instruments on the person of an individual or in a conveyance, article of luggage, merchandise, or other container, and transport or transfer or attempt to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, in violation of Title 31, United States Code, Section 5332.

Overt Acts

9. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about December 20, 2020, at approximately 11:00 a.m., JESUS MANUEL BRITO met with a flight attendant ("Flight Attendant-1") employed by an international airline (the "International Airline") at Flight Attendant-1's apartment in the Bronx. During the meeting, JESUS MANUEL BRITO gave Flight Attendant-1 approximately $61,215 in United States currency and told Flight Attendant-1 that a man would take the cash from her upon her arrival in the Dominican Republic.

    b. On or about December 20, 2020, before boarding an International Airline flight to the Dominican Republic on which she was scheduled to work, Flight Attendant-1

3

reported her possession of $1,000 on a Customs and Border Protection ("CBP") form and presented approximately $1,215 from her wallet upon inspection. Further inspection by CBP personnel revealed three bundles of approximately $60,000 in United States currency concealed in Flight Attendant-1's purse.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

10. I have been a Special Agent with HSI for approximately four years. During that time, I have participated in numerous investigations of unlawful drug distribution, associated money laundering, and fraud. During the course of those investigations, I have conducted or participated in surveillance, drug transactions with undercover officers ("UC's"), the introduction of UC's, the execution of search warrants, debriefings of witnesses, and reviews of taped conversations and drug records. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are imported and distributed; the way in which illegal drugs are prepared, packaged, and sold on the street; some of the methods of payment for such drugs; and some of the methods that are used to disguise the source and nature of the profits made by drug dealers. I have also become familiar with how frauds are perpetrated, including frauds against government agencies.

11. I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other HSI Special Agents and Task Force Officers ("TFOs"), and other law enforcement officers; conversations with cooperating witnesses ("CWs"); reviews of reports and other documents prepared by agents and others; and physical surveillance.

12. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer or CW to whom I have spoken or whose reports I have read and reviewed. In addition, unless otherwise noted, the conversations from which the statements referenced herein were sourced were conducted principally in Spanish and later translated into English. All statements referenced herein are among many statements made by others and they are set forth

4

in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

13. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Application, I rely only on the facts stated herein.

### Background to the Investigation

14. From my training and experience, including my experience in this investigation, I have learned, among other things, that international narcotics traffickers often accumulate large cash proceeds from the sale of narcotics in the United States that need to be moved outside of the United States. In particular, I have learned that narcotics traffickers who operate from the Dominican Republic often prefer to receive the proceeds from their illegal activity in cash, rather than relying on banking services. This requires the smuggling of large quantities of cash from the United States to the Dominican Republic. One common tactic for smuggling cash to the Dominican Republic involves paying flight attendants who work routes between U.S. cities and the Dominican Republic to move large quantities of cash because they can often avoid inspection by CBP.

15. Since approximately December 2018, HSI and the New York City Police Department ("NYPD") (the "Investigating Agencies") have been investigating an international drug trafficking and money laundering organization (the "Brito MLO") involved in, among other things, trafficking fentanyl in the United States, and moving the proceeds of narcotics trafficking from, among other places, the United States to the Dominican Republic, including through the bulk smuggling of United States currency using flight attendants. The Brito MLO is comprised of, among others, JESUS MANUEL BRITO, the defendant; JESUS MANUEL BRITO's father, JOSE RAFAEL BRITO, the defendant; and JESUS MANUEL BRITO's uncle (the "Uncle").

16. The investigation into the Brito MLO has, among other things, involved the use of two Undercover Agents ("UC-1"

5

and "UC-2," collectively, the "UC's"). UC-1's cover story with the Brito MLO was that he was a narcotics trafficker (primarily of heroin and cocaine) in and around New York City with at least one source of supply in the Dominican Republic. UC-1's source of supply in the Dominican Republic provided UC-1 with narcotics on a consignment basis and, because of that, UC-1 had to periodically send some of the proceeds of his narcotics sales back to his source of supply in the Dominican Republic in cash in order to maintain the connection. UC-1 introduced UC-2 as another narcotics trafficker who tended to deal in prescription drugs, such as the purported oxycodone pills the Brito MLO was able to source.

17.   Over the course of the investigation, UC-1 has moved more than $200,000 in law enforcement funds represented to be the proceeds of narcotics trafficking from the Southern District of New York to the Dominican Republic using the Brito MLO. In addition, over the course of the investigation, UC-1 and UC-2 have purchased thousands of pills containing a detectable amount of fentanyl from the Brito MLO in the Southern District of New York.

18.   During the investigation of the Brito MLO, I reviewed a number of bank accounts associated with JESUS MANUEL BRITO, the defendant. During my review, I noticed that a company owned and operated by JESUS MANUEL BRITO, JMBM Consultant Inc., applied for and received funding through the SBA's EIDL program in or about July 2020. As discussed further below, JESUS MANUEL BRITO received this funding under false pretenses.

### The Brito MLO's Money Movement and Narcotics Dealing

19.   As part of the investigation, UC-1, met with JESUS MANUEL BRITO, the defendant, in the Southern District of New York on multiple occasions. As discussed further below, during these meetings, UC-1 and JESUS MANUEL BRITO discussed money laundering and narcotics trafficking. Cumulatively, UC-1 provided JESUS MANUEL BRITO with over $200,000 in funds ("Money Drops") that UC-1 represented to be narcotics proceeds—but which were actually government funds—and which JESUS MANUEL BRITO agreed to make available to UC-1 in the Dominican Republic, minus a fee ("Money Pickups," and, together with Money Drops, "Money Movements"). Several days after each occasion that UC-1 provided JESUS MANUEL BRITO with ostensible narcotics proceeds, UC-1 would meet with JOSE RAFAEL BRITO, the defendant, and/or the Uncle in the Dominican Republic and receive a comparable amount of cash, minus the Brito MLO's agreed-upon fee.

6

Money Movement 1: September 2019

20.    Based on, among things, my review of recorded conversations between UC-1 and JESUS MANUEL BRITO, the defendant, and the Uncle, and translations and reports of those conversations, I have learned the following about a Money Movement set up by UC-1 and carried out by the Brito MLO in or about September 2019:

a.    On or about September 9, 2019, UC-1 met with JESUS MANUEL BRITO at a diner in Manhattan (the "Diner"). During the conversation, UC-1 asked JESUS MANUEL BRITO, among other things, if JESUS MANUEL BRITO sent money to the Dominican Republic. UC-1 told JESUS MANUEL BRITO that he (UC-1) sold narcotics on consignment for a source of supply in the Dominican Republic and needed to send the proceeds of those narcotics sales back to the Dominican Republic periodically in order to maintain his source of supply. JESUS MANUEL BRITO responded that he sent approximately $400,000 to $500,000 in cash to the Dominican Republic on a weekly basis and that he generally charged 8% of the money moved as a fee. JESUS MANUEL BRITO stated that his father, JOSE RAFAEL BRITO, the defendant, and the Uncle handled the money once it was brought down to the Dominican Republic and made sure it was delivered to the correct recipient. JESUS MANUEL BRITO also stated, in substance and in part, that he owns a medical transportation business in the Bronx called Premium that he uses to launder cash. He explained that, because Premium takes in large payments from insurers, such as Medicaid, as well as cash from its drivers, bank personnel would ask no questions about the money coming into Premium's bank accounts. UC-1 told JESUS MANUEL BRITO that he would like to try the Brito MLO's services with a small amount of money, such as $20,000 to $30,000.

b.    On or about September 20, 2019, UC-1 met with JESUS MANUEL BRITO in UC-1's car outside the Diner to conduct a Money Drop. UC-1 provided JESUS MANUEL BRITO with approximately $30,000 in ostensible narcotics proceeds for the purpose of sending it to the Dominican Republic. JESUS MANUEL BRITO confirmed that the Brito MLO's fee was 8% and that the Uncle would give UC-1 the money in the Dominican Republic less the Brito MLO's fee (that is, approximately $27,600). JESUS MANUEL BRITO told UC-1 to send him a message the day that UC-1 wanted to pick up the money and JESUS MANUEL BRITO would make sure that the Uncle delivered it. JESUS MANUEL BRITO explained that he often sent money to the Dominican Republic using flight

attendants because they are generally able to avoid inspection due to a loop hole in security—namely, that flight attendants know in advance when they will be screened and can thus generally avoid screening. JESUS MANUEL BRITO assured UC-1 that, if the money was intercepted during screening, he (JESUS MANUEL BRITO) would make UC-1 whole.

        c.    On or about September 25, 2019, UC-1 sent JESUS MANUEL BRITO a text message saying that he (UC-1) was in the Dominican Republic and wanted to pick up the money the next day. JESUS MANUEL BRITO responded that he was going to contact the Uncle so that UC-1 could coordinate with the Uncle for the Money Pickup. Later the same day, UC-1 sent a text message to the Uncle to set up the Money Pickup; they confirmed the time and place the next morning.

        d.    On or about September 26, 2019, at approximately 12:16 p.m., UC-1 met the Uncle at a location in the Dominican Republic. The Uncle, who confirmed that his name was the same name JESUS MANUEL BRITO had given UC-1 and that he was JESUS MANUEL BRITO's uncle, gave UC-1 approximately $27,600—i.e., the $30,000 UC-1 had given JESUS MANUEL BRITO, less the Brito MLO's 8% fee.

### Money Movement 2: November 2019

    21.    Based on, among things, my review of recorded conversations between UC-1 and JESUS MANUEL BRITO, the defendant, JOSE RAFAEL BRITO, the defendant, and the Uncle, and translations and reports of those conversations, I have learned the following about a Money Movement set up by UC-1 and carried out by the Brito MLO in or about November 2019:

        a.    On or about November 5, 2019, UC-1 met with JESUS MANUEL BRITO in UC-1's car outside the Diner to conduct another Money Drop. UC-1 provided JESUS MANUEL BRITO with approximately $30,000 in ostensible narcotics proceeds for the purpose of sending it to the Dominican Republic. JESUS MANUEL BRITO told UC-1 to confirm the exact date that he (UC-1) would be in the Dominican Republic so that JESUS MANUEL BRITO could set up the Money Pickup. JESUS MANUEL BRITO also reconfirmed the Brito MLO's 8% fee. UC-1 asked JESUS MANUEL BRITO whether he had a source of supply for cocaine. JESUS MANUEL BRITO explained that things were "hot" in the Dominican Republic due to a recent seizure in Puerto Rico of a significant quantity of narcotics sent from the Dominican Republic, but, when things quieted down,

he was going to reach out to his narcotics contacts in the Dominican Republic again.

   b. On or about November 12, 2019, UC-1 sent JESUS MANUEL BRITO a text message saying that he (UC-1) was in the Dominican Republic and wanted to pick up the money from the Uncle the next day. JESUS MANUEL BRITO responded that he was going to contact the Uncle so that UC-1 could coordinate with the Uncle for the Money Pickup. Later the same day, UC-1 received a text message confirming the time and place for the Money Pickup the next day.

   c. On or about November 13, 2019, at approximately 11:55 a.m., UC-1 met with the Uncle at a location in the Dominican Republic. The Uncle , gave UC-1 approximately $27,600—i.e., the $30,000 UC-1 had given JESUS MANUEL BRITO, less the Brito MLO's 8% fee.

<u>Money Seizure: December 20, 2019</u>

  22. As discussed above, JESUS MANUEL BRITO, the defendant, told UC-1 that he uses flight attendants to move money from the United States to the Dominican Republic. Based on my review of, among other things, license plate reader ("LPR") records, New Jersey Department of Motor Vehicle Records, my review of records from a Department of Homeland Security ("DHS") database, and my involvement in this investigation, I know that, in or about 2019, certain vehicles associated with and/or registered to JESUS MANUEL BRITO were in the vicinity of John F. Kennedy International Airport ("JFK") on approximately ten occasions when he did not have a scheduled flight out of JFK. Based on my review of the same DHS database and records provided by the International Airline, I know that those approximately ten occasions corresponded to dates on which Flight Attendant-1 and/or another flight attendant employed by the International Airline ("Flight Attendant-2") were scheduled to work flights from JFK to the Dominican Republic.

  23. For example, based on my review of LPR records, I know that, on or about December 19, 2019, at approximately 9:00 p.m., a car that JESUS MANUEL BRITO, the defendant, has previously driven when meeting with UC-1 was in the vicinity of JFK. Based on this trip to JFK, HSI contacted CBP to conduct an outbound inspection of an International Airline flight scheduled to fly from JFK to the Dominican Republic on or about December 20, 2019. Both Flight Attendant-1 and Flight Attendant-2 were scheduled to work on this flight.

9

24.     Based on my discussions with other members of law enforcement and my review of certain law enforcement reports, I know the following:

      a.   On or about December 20, 2019, at approximately 12:00 p.m., a CBP officer conducted the outbound inspection requested by HSI and spoke with Flight Attendant-1. The CBP officer explained currency reporting requirements under U.S. law to Flight Attendant-1, which Flight Attendant-1 acknowledged. Flight Attendant-1 then declared approximately $1,000 on a CBP form and presented approximately $1,215 to the CBP officer that was in Flight Attendant-1's wallet. Upon further inspection, the CBP officer found three bundles of United States currency, amounting to approximately $60,000, wrapped in white paper and concealed in Flight Attendant-1's purse. The money was seized by law enforcement.

      b.   Thereafter, Flight Attendant-1 told the CBP officer that, earlier that day, she (Flight Attendant-1) had met with JESUS MANUEL BRITO, the defendant, at her apartment in the Bronx and that he had given her what he said was $10,000 in cash. JESUS MANUEL BRITO instructed her that she should give the cash to an older man with grey hair and glasses when she arrived at the airport in the Dominican Republic. Based on my involvement in the investigation, I know that this description is consistent with the Uncle's appearance.

Money Movement 3: January 2020

25.     Based on, among things, my review of recorded conversations between UC-1 and JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, and translations and reports of those conversations, I have learned the following about a Money Movement set up by UC-1 and carried out by the Brito MLO in or about January 2020:

      a.   On or about January 7, 2020, UC-1 met with JESUS MANUEL BRITO in UC-1's car outside the Diner to conduct another Money Drop. UC-1 provided JESUS MANUEL BRITO with approximately $75,000 in ostensible narcotics proceeds for the purpose of sending it to the Dominican Republic. JESUS MANUEL BRITO told UC-1 to confirm the exact date that he (UC-1) would be in the Dominican Republic so that JESUS MANUEL BRITO could set up the Money Pickup. JESUS MANUEL BRITO also reconfirmed the Brito MLO's 8% fee, stating that he would be charging UC-1 $6,000 for this Money Movement. UC-1 followed up about JESUS

MANUEL BRITO's source of supply of narcotics in the Dominican Republic. JESUS MANUEL BRITO told UC-1 that he had been trying to build trust with a source of supply in the Dominican Republic by laundering money for the source. UC-1 asked if JESUS MANUEL BRITO could move up to $1,500,000 for him (UC-1). JESUS MANUEL BRITO said that he could. When UC-1 told JESUS MANUEL BRITO to be careful with the $75,000, JESUS MANUEL BRITO responded that his car had a "trap" or secret compartment in which to hide the cash.

   b. On or about January 13, 2020, UC-1 sent JESUS MANUEL BRITO a text message saying that he wanted to pick up the money the next day in the Dominican Republic. JESUS MANUEL BRITO responded that he was going to contact JOSE RAFAEL BRITO so that UC-1 could coordinate with him for the Money Pickup.

   c. On or about January 14, 2020, UC-1 and JOSE RAFAEL BRITO set up a time and place for the Money Pickup. At approximately 2:48 p.m., UC-1 met with JOSE RAFAEL BRITO at a restaurant in the Dominican Republic. During their conversation, UC-1 told JOSE RAFAEL BRITO that he already had a narcotics connection in the Dominican Republic, whom he paid to bring the drugs up to New York City, but was looking for another narcotics connection in the Dominican Republic. JOSE RAFAEL BRITO responded that he had contacts for heroin and cocaine, including a heroin connection in New York whom he would be willing to introduce to UC-1 through JESUS MANUEL BRITO. JOSE RAFAEL BRITO also asked UC-1 if UC-1 was able to get fentanyl pills in the United States. At a certain point in the conversation, JOSE RAFAEL BRITO told UC-1 that he regretted that his son, JESUS MANUEL BRITO, had gotten into the "money business" with him and noted that the Uncle was also part of his money business. At approximately 3:40 p.m., JOSE RAFAEL BRITO took UC-1 to his car. As he was driving, JOSE RAFAEL BRITO handed UC-1 a paper bag containing bundles of cash. Law enforcement later determined that the bag contained approximately $69,000—i.e., the $75,000 UC-1 had given JESUS MANUEL BRITO, less the Brito MLO's 8% fee.

   d. Given the explicitness of UC-1's conversation with JOSE RAFAEL BRITO about narcotics trafficking and the Brito MLO's money business, as well as the Money Pickup itself, I respectfully submit that there is probable cause to believe that JOSE RAFAEL BRITO believed that the money he gave UC-1 represented the proceeds of narcotics trafficking, and that the money being transferred on UC-1's behalf via JESUS MANUEL BRITO also represented the proceeds of narcotics trafficking.

### Narcotics Dealing and Money Movement 4: February-March 2020

26.     Based on, among things, my review of recorded conversations between UC-1 and JESUS MANUEL BRITO and JOSE RAFAEL BRITO, the defendants, translations and reports of those conversations, and my own involvement in this investigation, I have learned the following about controlled purchases of narcotics from JESUS MANUEL BRITO and a Money Movement set up by UC-1 and carried out by the Brito MLO in or about February and March 2020:

a.    On or about February 4, 2020, UC-1 met with JESUS MANUEL BRITO in UC-1's car outside the Diner. During the conversation, UC-1 and JESUS MANUEL BRITO discussed UC-1's meeting with JOSE RAFAEL BRITO in the Dominican Republic on or about January 14, 2020. JESUS MANUEL BRITO mentioned that he was in constant contact with JOSE RAFAEL BRITO about their money moving business. JESUS MANUEL BRITO told UC-1 that he had contacted JOSE RAFAEL BRITO's source of supply for heroin in New York and gotten a sample to share with UC-1. JESUS MANUEL BRITO also told UC-1 that one of JOSE RAFAEL BRITO's friends had been making money selling "M-30" prescription pills and had a large supply of them. JESUS MANUEL BRITO asked UC-1 if he was interested in buying these pills at a price of $10 apiece. UC-1 said that he was not personally interested, but his friend would be. Based on my training and experience, and my discussions with other members of law enforcement, I understand that M-30 is slang for 30 milligram oxycodone hydrochloride pills.

b.    On or about February 11, 2020, UC-1 and UC-2 met with JESUS MANUEL BRITO outside the Diner. In exchange for approximately $1,000 in law enforcement funds, JESUS MANUEL BRITO provided UC-2 with a jar containing approximately 100 blue pills purported to be Oxycodone. A subsequent NYPD laboratory test revealed that a sample of these pills contained a mixture of fentanyl, tramadol, and 4-anilino-N-phenethyl-4-piperidine ("ANPP"), all of which are federally controlled substances. The untested pills were consistent with the tested pills in terms of size, shape, color, and physical markings. In aggregate, the pills weighed approximately 14.15 grams.

c.    On or about February 25, 2020, UC-2 met with JESUS MANUEL BRITO outside the Diner. In exchange for approximately $2,000 in law enforcement funds, JESUS MANUEL BRITO provided UC-2 with a Ziploc bag containing approximately

200 blue pills purported to be Oxycodone. A subsequent NYPD laboratory test revealed that a sample of these pills contained a mixture of fentanyl and other substances. The untested pills were consistent with the tested pills in terms of size, shape, color, and physical markings. In aggregate, the pills weighed approximately 25.219 grams.

      d.  On or about March 3, 2020, UC-2 met with JESUS MANUEL BRITO outside the Diner. In exchange for approximately $2,000 in law enforcement funds, JESUS MANUEL BRITO provided UC-2 with a Ziploc bag containing approximately 200 blue pills purported to be Oxycodone. A subsequent NYPD laboratory test revealed that seven of ten sampled pills contained a mixture of fentanyl and other substances. The presence of fentanyl could not be ruled out or confirmed in the other three sampled pills because of co-elution between the chemical compounds in the pills.[1] All of the pills, however, tested and untested, were consistent in terms of size, shape, color, and physical markings. In aggregate, the pills weighed approximately 16.3 grams.

      e.  On or about March 4, 2020, UC-1 met with JESUS MANUEL BRITO in UC-1's car outside the Diner to conduct another Money Drop. UC-1 provided JESUS MANUEL BRITO with approximately $100,000 in ostensible narcotics proceeds for the purpose of sending it to the Dominican Republic. UC-1 asked that the money be available in the Dominican Republic on or about March 10, 2020. JESUS MANUEL BRITO responded that that was enough time to make the money available and that he would coordinate with his father, JOSE RAFAEL BRITO, to ensure that it was available. JESUS MANUEL BRITO also reconfirmed the Brito MLO's 8% fee, stating that he would be charging UC-1 $8,000 for this Money Movement. UC-1 told JESUS MANUEL BRITO that he had a Colombian friend who was interested in buying the same pills that JESUS MANUEL BRITO was selling to UC-2 (the "Colombian"). UC-1 asked JESUS MANUEL BRITO if he was interested in going into business with UC-1 to sell the pills to the Colombian; JESUS MANUEL BRITO indicated that he was indeed interested, as he had made a commitment to his source of supply (JOSE RAFAEL BRITO's friend) to sell approximately 50,000 pills per month.

      f.  On or about March 9, 2020, UC-1 sent JESUS MANUEL BRITO a text message saying that he was in the Dominican

---

[1] Co-elution refers to a phenomenon in chemistry whereby chemical compounds cannot be chromatographically differentiated and therefore cannot be specifically identified.

13

Republic and wanted to pick up the money the next day. JESUS MANUEL BRITO responded that he was going to contact JOSE RAFAEL BRITO so that UC-1 could coordinate with him for the Money Pickup.

    g. On or about March 10, 2020, UC-1 and JESUS MANUEL BRITO set up a time and place for the Money Pickup because UC-1 was having difficulty reaching JOSE RAFAEL BRITO. At approximately 1:26 p.m., UC-1 met with JOSE RAFAEL BRITO in the Dominican Republic in UC-1's car. JOSE RAFAEL BRITO gave UC-1 a bag containing bundles of cash. During their discussion, UC-1 told JOSE RAFAEL BRITO that things were going well in New York—meaning UC-1's narcotics sales—and asked if JESUS MANUEL BRITO had mentioned that UC-1 had introduced UC-2 to JESUS MANUEL BRITO and that JESUS MANUEL BRITO was selling UC-2 a significant amount of pills. JOSE RAFAEL BRITO responded that he had heard about UC-2. UC-1 also mentioned that the Colombian was interested in buying pills from JESUS MANUEL BRITO and that UC-1 had broached taking a percentage of the sale proceeds, which JESUS MANUEL BRITO agreed to. JOSE RAFAEL BRITO appeared to signal his agreement, as well, and remarked that no one moved anything for free.

    h. Later on or about March 10, 2020, UC-1 and other members of law enforcement later determined that the bag only contained approximately $79,000, approximately $13,000 less than expected. At approximately 5:28 p.m., after confronting JESUS MANUEL BRITO about the discrepancy via text message, UC-1 met with JOSE RAFAEL BRITO again, who provided UC-1 with the missing $13,000. UC-1 told JOSE RAFAEL BRITO that he had given the $79,000 to his "people" as "payment" and, when they later realized the money was short, they threatened to kill him. JOSE RAFAEL BRITO apologized for the mistake multiple times and asked UC-1 to blame him for it, not JESUS MANUEL BRITO. Based on UC-1 and JOSE RAFAEL BRITO's explicit discussion of narcotics dealing and money movement, I respectfully submit that UC-1's ruse that the missing $13,000 resulted in him being threatened with violence would have further confirmed for JOSE RAFAEL BRITO that UC-1 was moving the proceeds of narcotics trafficking.

    i. On or about March 18, 2020, UC-2 met with JESUS MANUEL BRITO at an address in the Bronx. In exchange for approximately $1,000 in law enforcement funds, JESUS MANUEL BRITO provided UC-2 with an envelope containing approximately 96 blue pills purported to be Oxycodone. A subsequent NYPD laboratory test revealed that a sample of these pills contained

14

a mixture of fentanyl and other substances. In aggregate, the pills weighed approximately 15.552 grams.

### Additional Narcotics Dealing and Money Movement: April-October 2020

27. Based on, among things, my review of recorded conversations between UC-1 and JESUS MANUEL BRITO, the defendant, translations and reports of those conversations, my conversations with other members of law enforcement, and my own involvement in this investigation, I have learned the following about controlled purchases of narcotics from JESUS MANUEL BRITO and money movement carried out by the Brito MLO from in or about April 2020 to October 2020:

    a. As set forth below, over the course of in or about April 2020 to October 2020, JESUS MANUEL BRITO sold UC-1 and UC-2 approximately 4,364 purported Oxycodone pills for approximately $45,000. These controlled buys transpired consistent with the controlled buys described above: UC-1 or UC-2 met JESUS MANUEL BRITO in a car in the Bronx or Manhattan, primarily in the vicinity of the Diner, 1932 Walton Avenue, or Premium, and exchanged cash for the narcotics. NYPD laboratory testing of a sample of the pills confirmed that they contained a mixture of fentanyl and other substances, and that the untested pills were consistent with the tested pills in terms of size, shape, color, and physical markings.

| Date | Approximate Number of Pills | Approximate Aggregate Weight | Purchase Amount |
|---|---|---|---|
| April 9, 2020 | 104 | 14.56 grams | $1,000 |
| April 21, 2020 | 100 | 14.09 grams | $1,000 |
| May 7, 2020 | 100 | 13.71 grams | $1,000 |
| May 21, 2020 | 200 | 28 grams | $2,000 |
| June 11, 2020 | 200 | 22.99 grams | $2,000 |
| July 7, 2020 | 200 | 23.06 grams | $2,000 |
| July 21, 2020 | 200 | 27.48 grams | $2,000 |
| August 12, 2020 | 200 | 23.92 grams | $2,000 |
| September 22, 2020 | 199 | 22.913 grams | $2,000 |
| September 24, 2020 | 998 | 109.7 grams | $10,000 |
| September 29, 2020 | 994 | 109.7 grams | $10,000 |
| October 13, 2020 | 1,010 | 110.7 grams | $10,000 |
| December 8, 2020 | 500 | Pending | $5,000 |
| | **5,005** | **520.823 grams** | **$50,000** |

    b. On or about June 30, 2020, UC-1 "gifted" JESUS MANUEL BRITO a money counter (the "Money Counter") so that JESUS MANUEL BRITO could accurately count cash provided to him by UC-1 and other individuals who gave JESUS MANUEL BRITO cash for the purpose of laundering said funds. Unbeknownst to JESUS MANUEL BRITO, one day earlier, United States Magistrate Judge Sarah L. Cave issued a warrant allowing the Investigating Agencies to receive "Currency Count Information" from the Money Counter (i.e. the order authorized the Investigating Agencies to receive, in real-time, the quantity, denominations, and total value of all bills counted using the Money Counter). The same order also allowed the Investigating Agencies to attach to the Money Counter a GPS device that would transmit to the Investigating Agencies contemporaneous information regarding the Money Counter's location. Collectively, this information revealed the following:

    i. On or about June 30, 2020, after the Money Counter was provided to JESUS MANUEL BRITO, it was transported to a residential building ("Residential Building-1") in the Bronx, New York, which includes an apartment that is a known residence of a co-conspirator ("CC-1"), whom I understand to be JESUS MANUEL BRITO's romantic partner based on my involvement in this investigation ("the "CC-1 Residence"). Thereafter, over the course of the same day, and while still inside Residential Building-1, the Currency Count Information revealed that at least $91,913 was run through the Money Counter.[2]

    ii. GPS tracking information revealed that on or about July 1, 2020, the Money Counter was transported to a hair salon ("Salon-1") located at an address in the Bronx, New York (the "Salon-1 Address"), where it remained for at least

---

[2] On several occasions a large quantity of bills (and corresponding aggregate value of money) would be run through the Money Counter, and then, very shortly thereafter, an identical quantity of bills (and corresponding aggregate value of money) would again be run through the Money Count. For the purpose of this complaint, I am assuming that these "subsequent money runs," conducted almost immediately after the initial monetary run, entailed the identical set of bills (i.e., bearing the same serial numbers) being run through the machine to confirm the accuracy of the initial account. As such, I have not included (or "double-counted") these subsequent runs in calculating the above-mentioned $91,913 figure, or in calculating any other aggregate monetary figure in this affidavit.

several weeks. Currency Count Information revealed that during the period between on or about July 1, 2020 and July 6, 2020, at least $178,653 was run through the Money Counter. The Currency Count Information further revealed that during this date range, money was run through the Money Counter on multiple occasions each day, and over 100 times total. While on rare occasion, smaller quantities of cash were run through the machine—including a single occasion in which less than $100 was run through the machine—on over 60 separate occasions, more than $1,000 was run through the machine. Based on my training and experience, these quantities of cash are consistent with narcotics proceeds and/or money laundering funds, and inconsistent with proceeds from a legitimate hair salon business.

       iii.    A review of records maintained by Chase Bank reveals that, among other things: a business checking account for Salon-1 was opened at Chase Bank in January 2014 (the "Chase Salon Account"); JESUS MANUEL BRITO is listed as the President of Salon-1; Salon-1 is located at the Salon-1 Address; and there are two authorized signatories on the Chase Salon Account: JESUS BRITO and CC-1.

       iv.    During my personal surveillance of Salon-1, I observed that the signage immediately above Salon-1 bears the name of Salon-1.  However, a review of bank records maintained by TD Bank for a particular business checking account (the "TD Bank Salon Account") revealed that the TD Bank Salon Account is held in the name of a different salon ("Salon-2"), purportedly located at the Salon-1 Address.  A review of these TD Bank records further reveals that: the TD Bank Salon Account was opened in or around July 2017; the TD Bank Salon Account is held in the name of CC-1 doing business as Salon-2; CC-1 is listed as the primary contact for Salon-2; and CC-1 provides a home address of the CC-1 Residence.

      WHEREFORE, I respectfully request that a warrant be issued for JESUS MANUEL BRITO and JOSE RAFAEL BRITO,  the

defendants and that they be arrested, and imprisoned or bailed, as the case may be.

/s authorized electronic signature
_____
CHRISTOPHER FANT
Special Agent
Homeland Security Investigations

Sworn to by telephone in accordance
with Fed. R. Crim. P. 4.1
this 15th day of October, 2021

_____
HONONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York